IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DANA CARPENTER, as Administratrix of )
the Estate of James Carpenter, deceased, )
et al., )
         )
         Plaintiffs, )
         )
v. )    CIVIL ACTION NO.
         )    02-0625-BH-M
JACK TILLMAN, et al., )
         )
         Defendants. )

## ORDER

This action is now before the Court on plaintiffs' motions (Docs. 206-212 and 215) for partial summary judgment on the issue of liability of the City of Mobile ("Mobile") as to plaintiff's Third Claim for Relief (based upon the alleged breach of the City's non-delegable duty to ensure that the conditions of confinement of persons it arrested and caused to be detained in the Mobile Metro Jail in July, 2000, complied with the requirements of the Fourteenth Amendment) and on the issue of liability of the City of Mobile, its former Mayor, Michael Dow, its former safety director, Richard Cashdollar, its former chief judge for its municipal court system, James Lackey, and one of its municipal judges, Willie Huntley (collectively "the City defendants") as to plaintiff's Fourth Claim for Relief (based on the alleged breach of the City defendant's duty under

the Fourteenth Amendment to establish customs and policies for its municipal court intended to protect the liberty interests of persons arrested and detained by the City, including the right to a prompt initial appearance and the panoply of rights served by this appearance).   This action is also before the Court on plaintiff's motion (Doc. 222) to deem plaintiff's evidentiary submissions (Exhibits 1 through 34) filed by mail on December 3, 2003, as admissible evidence for purpose of these pending motions.  Upon consideration of the motions for summary judgment, the City defendants' response in opposition thereto (Docs. 216-217), plaintiff's replies (Docs. 218-219), and all other pertinent portions of the record, the Court concludes that the motions are due to be denied.  As to the motion regarding plaintiff's evidentiary submission of December 3, 2003, the Court will grant the motion despite defendants' present objections (Doc. 226) inasmuch as the defendants are not prejudiced by same.

## UNDISPUTED FACTS

The essential undisputed facts in this case have already been set forth in Judge Butler's Order (Doc. 127) entered on August 6, 2003:

> In the early morning hours of July 13, 2000, City of Mobile police officers arrested James Carpenter for disorderly conduct, resisting arrest, and failure to obey a police officer. [] The City of Mobile police officers then took Mr. Carpenter to Mobile Metro Jail. [] Upon arrival at Mobile Metro Jail, bond was established for Mr. Carpenter whereupon he would have been released after posting bail. Id. The Mobile Metro Jail was built in the early 1990's as a joint jail for both the City of Mobile ("City") and Mobile County ("County"), under an agreement ("Agreement") dated May 25, 1989, to which both parties and the Sheriff of Mobile County ("Sheriff") were

2

signatory parties. [] Mobile Metro Jail was operated at the time of the incident pursuant to the Agreement. []

The Agreement, in ¶ E.1., provides

> The County agrees to accept and provide for the secure custody, care and safekeeping of City detainees in accordance with laws, standards, policies, procedures or court orders applicable to the operations of the joint jail facility.

[] Furthermore, the Agreement, in ¶ E.2., provides that the "County agrees to provide City prisoners with the same level of medical care and services provided to County prisoners[.]" [] Because Mr. Carpenter failed to post bail, he stayed in Mobile Metro Jail until he died on July 27 or 28, 2000. [] On the morning of July 28, 2000, Mr. Carpenter was found by the Mobile Metro Jail staff on the floor of his cell dead, naked, emaciated, and handcuffed, with raw infections covering his body, notably his wrists and ankles. [] After an autopsy, a doctor with the Alabama Department of Forensic Sciences concluded that Mr. Carpenter died of "infectious complications associated with restraint injuries of extremities;" and that the infections that killed Mr. Carpenter were found to have resulted from "multiple circumferential ulcers of both ankles; and abrasions, contusions, and ulcers of both wrists." []

Doc. 127 at 1-2 (record citations omitted).  In addition, it is undisputed that:

1.     Mr. Carpenter was never seen by a medical or mental health care professional at the Jail at any time between Mr. Carpenter's entry into the Jail on the night of July 12, 2000, and July 28, 2000, when he was discovered dead in his Jail cell. (Tab #1, p. 2.)[1]

---

[1] The record citations herein are to the documents (Doc. 48)  filed by the plaintiff on December 4, 2002 in oppositions to the defendants' then pending dispositive motions and designated in two volumes under Tabs 1 through 34.

3

2.      At approximately 8:15 A.M., July 13, 2000, about 8 hours after entering the

Mobile Metro Jail, Jail records state that Mr. Carpenter had flooded his jail cell and had

used a bed sheet to tie the door to an adjacent cell locking himself in; that he appeared

agitated or upset and was pacing the floor stating "they are trying to kill me." (Tab #11.)

The Jail officials' response was to transfer Mr. Carpenter out of the general jail

population area of the Jail and into cell 1045, a single-bunked cell in the 1002 area or the

"B" wedge of the "Administrative Segregation" section of the Jail.

3.      The Mobile Metro Jail, including the Administrative Segregation section

where Mr. Carpenter was housed in Cell 1045, was staffed 24 hours a day by three shifts

of Correction Officers who each worked an 8 hour shift in 2000. (Tab #19, p. 7-11.)   Lt.

Smith, the Sheriff Department's designee, testified in deposition that the "floor officer"

on duty for each of these shifts was required by the Jail's Standard Operating Procedures

("SOPs"), the written rules or policies pursuant to which the Jail was intended to have

been operated in 2000, to have observed Mr. Carpenter in Cell 1045, every 15 minutes of

each day of Mr. Carpenter's detention. (Tab #13, p. 267.)   He testified that the purpose of

each of these "observations" or checks made every 15 minutes was "make sure

everybody's okay, i.e., alive." (Tab #13, p. 272.)   Additionally, the floor officer generally

fed or made sure that the inmates in Administrative Segregation were fed. (Tab #13, p.

276.)

4.      Plaintiff contends that the evidence compiled after Mr. Carpenter's death, including "the obviousness of Mr. Carpenter's mental illness, the condition of Mr. Carpenter during this period and of his cell, his being shackled in handcuffs and leg irons, and the obvious injuries to his hands and wrists," constitutes evidence that each member of the jail staff who were "required to check on Mr. Carpenter's safety and well-being at least 32 times during each of the shifts he or she was assigned to in Mr. Carpenter's wedge during the 15-16 days he was detained at the Jail, was deliberately indifferent to the violations of Mr. Carpenter's constitutional rights that occurred during Mr. Carpenter's detention at the Mobile Metro Jail and which resulted in his death."  In view of that evidence, plaintiff indeed reached a settlement with those defendants directly responsible for operations of the Mobile Metro Jail.

5.      Although evidence has been proffered that, according to both the Special Grand Jury convened by the Mobile District Attorney (Tab #1, p. 4-5.) and the Sheriff's own investigations (Tabs #18, p. 5, and  #19, p. 71.) following Mr. Carpenter's death, the Mobile Metro Jail was not being operated in compliance with the Jail's own "rules and regulations," i.e., the Mobile Metro Jail's Standard Operating Procedures (SOPs), the record is devoid of any evidence that the City defendants knew or should have known about such lack of compliance prior to Mr. Carpenter's death.  No other similar incident of death, physical injury or deliberate indifference to any serious medical illness has been alleged to have occurred prior to July 13-28, 2000.

6.      Defendant Willie J. Huntley was a part-time Municipal Judge for City of Mobile in 2000. His superior was the presiding Municipal Judge, Jim Lackey, who was a full-time Municipal Judge. (Tab #27, p. 8.)  In 2000, Judge Jim Lackey reported to the City of Mobile's Chief of Public Safety, Dick Cashdollar. Mr. Cashdollar reported to the City of Mobile's Mayor, Mike Dow. (Tab #27, p. 9.)

7.      One of Willie Huntley's duties as a City of Mobile Municipal Judge was to conduct arraignments/initial appearance hearings at the Mobile Metro Jail for persons arrested by the City and charged by the City with violations of municipal ordinances. (Tab #27, p. 11.)  With respect to this duty, Judge Huntley presided at court sessions held in a courtroom located within the Mobile Metro County Jail. (Tab #27, p. 12.)  Judge Huntley handled all the municipal court dates at the Jail in July of 2000 except for one. (Tab #27, p. 18-19.)[2]

8.      The City of Mobile was the arresting and prosecuting authority for all of the charges against Mr. Carpenter in July 2000.  (Tab #27, p. 46.)  Judge Huntley testified that Mr. Carpenter's due process rights included the right to appear before a magistrate to determine his bond, the right to counsel, to be advised of the charges that he faces, what the penalties are and his right to a trial.  (Tab #27, p. 48.)

---

[2]Judge Huntley's normal schedule was to hold court on Mondays and Fridays and the Presiding Municipal Court Judge Coleman sat on Wednesdays.  However, in July of 2000, Judge Coleman was on vacation, so Judge Huntley was sitting every Monday, Wednesday and Friday during July, 2000. (Tab #27, p. 17.)

9.     Mittimus lists are orders from the Municipal Court directing the Mobile County Sheriff to produce the individuals on the list from their Jail cells into the Jail courtroom for an initial hearing/arraignment. (Tab #27, p. 50.)   Judge Huntley had the authority to enforce that order. (Tab #27, p. 51.)  The Court Mittimus lists for July 2000 were all signed by Judge Huntley.  (Tabs #28 and #29.)   Everyone who is arrested by the City and charged with a municipal ordinance violation by the City and who does not make bond is supposed to be on the Mittimus list. (Tab #27, p.21.)  These Mittimus lists were compiled by the City clerk and provided at the start of a court session to the Municipal Judge who was to preside at the court session. (Tab #27, p.22.)

10.     Judge Huntley acknowledged that, under Rules 4.3 and 4.4 of the Alabama Rules of Criminal Procedure, a person such as Mr. Carpenter, who had not made bond within 48 to 72 hours, is entitled to a hearing before the Municipal Judge.  (Tab #27, pp. 60-61.)  It was Judge Huntley's duty as the City's Municipal Judge to make sure Rules 4.3 and 4.4 were complied with and Mr. Carpenter's procedural due process rights were afforded him by the City.  (Tab #27, p. 59.)  Mr. Carpenter was not physically brought before Judge Huntley within the time frame.  (Tab #27, p. 61.)   In fact, Judge Huntley has never seen Carpenter.  (Tab #27, p. 71.)

11.     The Court met on Mondays, Wednesdays and Fridays.  If someone on the mittimus list does not appear their name is put on the list to appear on the next court date. (Tab #27, p. 77.)  This is referred to as a "roll over" on the Mittimus lists.  According to

Judge Huntley, there may be a number of reasons why a person is not brought before the Judge, including "someone [who] is acting out of control, and they don't want to bring that person into that room with everyone else." (Tab # 27, p. 72.) Judge Huntley doesn't know why Mr. Carpenter wasn't ever brought before him in July, 2000. The clerk wrote "rollover" on the July, 2000 Mittimus lists containing Mr. Carpenter's name and Judge Huntley signed these lists at the bottom. (Tab #27, p. 74.)

12.     Presiding Municipal Court Judge John Coleman was also deposed. Judge Coleman testified that Mr. Carpenter should have been on the Mittimus list for July 14, 2000, and should have appeared before Judge Willie Huntley on that date, but did not. (Tab #34, p. 103.) When Mr. Carpenter did not appear on Friday, July 14, 2000, Judge Huntley "rolled him over" to Monday, July 17, 2000, and Mr. Carpenter's name was added to the Mittimus list for that date. (Tab #27, p. 74.)

13.     This repetitive pattern of Mr. Carpenter's name being on the Mittimus list but not being brought to the Jail courtroom for an initial appearance before Judge Huntley, and the placing of a handwritten notation to "roll over" Mr. Carpenter's initial appearance to the following court date continued until Mr. Carpenter's death on July 28, 2000. (Tab #30.)[3]

---

[3]Mr. Carpenter's name actually continued to be "rolled over" for several court sessions into August, before someone realized that the Mittimus list were ordering the Sheriff to produce a man who had died in the Jail two weeks earlier. (Tab #27, p. 95.)

14.     The record contains no evidence that prior to July 28, 2000, any other person who had been arrested by the City of Mobile and unable to make bond had ever been deprived of the right to appear before a Municipal Judge within 48 to 72 hours of their incarceration.

## SUMMARY JUDGMENT STANDARD

The applicable standard has not changed since the entry of Judge Butler's Order of August 6, 2003 (Doc. 127).  That standard, as now adopted by the undersigned, is herein reproduced for the convenience of the parties and the Court:

> Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The district court must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-movant. *Alexander v. Fulton County*, 207 F.3d 1303, 1335 (11th Cir. 2000). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its burden, the burden shifts to the non-movant to "demonstrate that there is indeed a material issue of fact." Clark, 929 F.2d at 608. A factual dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing [substantive] law[.]" *Anderson*, 477 U.S. at 248.
>
> "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he

nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBHSiegen*, 965 F.2d 994, 998 (11th Cir. 1992). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton*, 965 F.2d at 999. If the non-moving party fails to make "a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To avoid summary judgment, the non-moving party "may not rest upon the mere allegations or denials of [its] pleading[.]" FED. R. CIV. P. 56(e). Nor may the nonmoving party defeat summary judgment by providing a mere "scintilla" of evidence. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir. 1999).

There must be a genuine factual conflict in the evidence to support a jury question. *Continental Cas. Co. v. Wendt*, 205 F.3d 1258, 1261 (11th Cir. 2000). However, the evidence need not be in a form that would be admissible at trial, as long as it could be reduced to admissible evidence. *Celotex*, 477 U.S. at 324-27. Flexibility is offered in the form of evidence submitted on summary judgment, but this flexibility does not eliminate a party's need to comply with the rules of evidence. *Id.*

## CONCLUSIONS OF LAW

### I.   <u>Third Claim for Relief</u>

According to the plaintiff, "[t]he basis for this claim is the principle established in <u>*Ancata vs. Prison Health Services, Inc.*</u>, 769 F.2d 700 (11th Cir. 1985) and recognized by [Judge Butler] in [his] prior order of August 6, 2003: that notwithstanding the City's contract with Mobile County and the Sheriff regarding operation of the Mobile Metro Jail, the City of Mobile, as the entity that arrested and caused Mr. Carpenter's detention, owed non-delegable duties to Mr. Carpenter, its pre-trial detainee, under the Fourteenth

Amendment and is civilly liable to plaintiff for Mr. Carpenter's death which resulted from the breach of these duties." (Plaintiff's Brief at 12.) The plaintiff essentially theorizes as follows:

- The City's contractual delegation of all responsibility for the care and custody of its pretrial detainees (a non-delegable duty) made the County the final policy decision-maker for the City on all issues relating to such care and custody, including the Fourteenth Amendment rights. (Plaintiff Brief at 13-14.)

- The plaintiff has submitted evidence which it contends establishes "the non-existence and/or inadequacy of any customs and policies of the *County* governing the operation of the Mobile Metro Jail in July, 2000, designed and intended to secure the constitutional rights of the City's pre-trial detainees." (*Id*. at 14-15, emphasis in original.) The evidence relied upon by the plaintiff includes the following:

  - Three reports resulting from investigations conducted following the death of Mr. Carpenter "which found that the Metro County Jail **staff** was being operated without effective policies and procedures in a wide variety of areas of its operation . . . and the Jail **staff**, in fact, had been instructed they did not have to follow and could 'disregard' the Jail's written [Standard Operating Procedures ("SOPs")] SOPs. (*Id*. at 15, emphasis added.) At least one of these reports is purported to be "based on interviews with several dozen **correctional officers**." (*Id*. at 32, emphasis added.)[4]

  - Photographs of Mr. Carpenter's body taken upon discovery of his death from which "there can be little dispute . . . that Mr. Carpenter's

---

[4]Of the three reports relied upon by the plaintiff, only the third which was prepared by Sgt. Dru Ryals of Internal Affairs (Tab. # 19) contains any list referencing the "[t]aped interviews of Mobile County Metro Jail Personnel" taken in connection with the subject investigation. (Ryals Report at 4-5.) That list contains sixty (60) names but the report later only summarizes the role of eleven (11) Correctional Officers (*Id*. at 38-52), four (4) Corrections Coporals (*Id*. at 52-55), ten (10) Corrections Sergeants (*Id*. at 55-65), and four (4) Medical Staff members (*Id*. at 70-71), as well as the Deputy Warden, Jim Owens, who had been Acting Warden for approximately one month prior to Mr. Carpenter's death (*Id*. at 69).

need for medical attention was obvious and that the Jail **personnel**, in failing to summon and provide medical care for more than two weeks, were deliberately indifferent to that need." (*Id*. at 19). Jail personnel were also deliberately indifferent to Mr. Carpenter's right to be free from unnecessary bodily restraint. (*Id*. at 21-30, emphasis added.)

- The aforementioned "testimony from several dozen members of the Jail **staff** (Tab # 19, pp. 37-71) that the Jail SOPs were regularly not being enforced or adhered to during July, 2000," according to the plaintiff, amounts to a declaration that such failure to enforce or adhere to the SOPs constituted a "longstanding and widespread practice" for which the policymaking officials must be deemed to have authorized. (*Id*. at 33.)

- "[T]he failures of Mobile County to promulgate and enforce customs and policies for the operation of the Mobile Metro Jail during July, 2000, reasonably designed to prevent violations of the Fourteenth Amendment rights of City detainees in the Mobile Metro Jail were a moving force behind these violations." (*Id*. at 36.)

Plaintiff's theory does not stand on solid footing for a number of reasons. Plaintiff seeks essentially to impose strict liability on the City for the actions or inactions of the Mobile Metro Jail **staff** despite the longstanding principle that a municipality cannot be held liable under 42 U.S.C. § 1983 based on a theory of *respondeat superior. Monnell v. Department of Social Services of the City of New York*, 436 U.S. 658, 663, 98 S.Ct. 2018, 2022, 56 L.Ed.2d 611 (1978). Although there is evidence that a number of Mobile Metro Jail officials ignored or failed to comply with the written SOPs, there is no evidence that any of those officials was a policymaking official for either the County or the Sheriff, and thereby for the City under the plaintiff's present theory. In point of fact, one of the very

reports relied upon by the plaintiff, namely the Report issued by Detective Dale Kohn of

the Mobile County Sheriff's Office (Tab # 18) contains the conclusion:

> IT APPEARED FROM THE BEGINNING OF THIS
> INVESTIGATION THAT THE MOBILE COUNTY METRO JAIL
> WAS NOT BEING PROPERLY OPERATED.
> UNSATISFACTORY OPERATIONS BEGAN FROM UPPER
> LEVEL SUPERVISORS OF THE JAIL ADMINISTRATION,
> DOWN TO THE LONE FLOOR OFFICERS.  METRO JAIL
> ADMINISTRATORS HAVE COUNTERMINDED SHERIFF
> JACK TILLMAN'S AUTHORITY, BY ALLOWING THE RULES
> AND PROCEDURES THAT SHERIFF TILLMAN HAD IN
> PLACE FOR THE DAILY OPERATION OF THE JAIL TO BE
> TOTALLY DISREGARDED.  AS A DIRECT RESULT OF CHIEF
> TIM BARBOUR, EX-WARDEN RICK GASTON AND DEPUTY
> WARDEN JIM OWEN'S MISHANDLING OF THE METRO JAIL
> AND THE JAIL EMPLOYEES, A DEATH SUCH AS JAMES
> CARPENTERS WAS ALLOWED TO HAPPEN.

(Kohn Report at 5, emphasis handwritten in original.)  Similarly, the Report issued by

Sgt. Dru Ryals (Tab #19) contains the following conclusion:

> Deputy Warden [Jim Owens] did not ensure that the SOP was
> followed in any respect at all, at any time. . . .

> • • •

> Deputy Warden Owens had the opportunity to guard against the
> circumstances that caused Carpenter's death.  Everything that went
> wrong with Carpenter, could have been prevented, had Deputy
> Warden Owens done his job.  He failed, and a man died as a result of
> his negligence.

(Ryals Report at 69.)  Finally, the Grand Jury Report (Tab # 1) on which the plaintiff

relies concluded not only that "a massive systemic failure in the administration of the

Mobile County Metro Jail resulted in Mr. Carpenter's death" but that "[t]he Mobile

County Metro Jail had Standard Operating Procedures (SOPs) on the books which, if followed, could have prevented Mr. Carpenter's death."  (Grand Jury Report at 4.)  Not one of these three reports contains any evidence from which this Court could conclude that a policymaking official of either the County, the Sheriff's Department or the City instituted any policy by which Mr. Carpenter's constitutional rights were violated.  *See e.g.*, *Ancata*, 769 F.2d at 705, n. 8 ("[I]f a constitutional tort committed by an employee of Prison Health Services was not a result of the policy or custom of the entity, then the county would not be liable.  Liability for the independent actions of a health service employee would be based upon respondeat superior and thus not actionable against the county under § 1983.")

        Nor is there any evidence in this record to support plaintiff's contention that the failure to comply with the Mobile Metro Jail's SOPs was a "longstanding and widespread practice" for which the County and the Sheriff, and thereby the City, must be deemed to have authorized.  Again, only two of the Reports relied upon by the plaintiff identify any time frame with regard to the failure to comply and that time frame commenced on "July 16, 2000," the date on which Deputy Warden (then Acting Warden) Jim Owens allegedly "issued a written memo which allowed the staff of the Mobile County Metro Jail to deviate from the Standing Operating Procedures that Sheriff Tillman had in place to operate the Mobile County Metro Jail."  (Kohn Report at 8; Ryals Report at 28.)  According to the Kohn Report, "Owens issued this order without the authorization of

14

Sheriff Tillman, nor did this memo indicate that Sheriff Tillman was made aware of this deviation by Chief Barbour." (Kohn Report at 8.)   According to the Ryals Report, the July 16, 2000 memo from Owens "is a direct conflict with [Owens'] taped statement to Internal Affairs" in which he claimed that "all SOPs are to be followed by all personnel." (Ryals Report at 28.)  Inasmuch as Mr. Carpenter's death occurred on July 27 or 28, 2000, the evidence of record establishes only that the failure to comply with the Mobile Metro Jail's SOPs had occurred during the eleven or twelve days preceding his death.  No other inmate or detainee is alleged to have experienced any violation of a constitutional right arising from any failure to comply with the Mobile Metro Jail's SOPs prior to or following Owens memo of July 16, 2000.  There is simply no evidence from which it can be said that the failure to comply with the Mobile Metro Jail's SOPs was either "longstanding" or "widespread."

Consequently, plaintiff has failed to establish a right to judgment in her favor on the City's liability for Mr. Carpenter's death under § 1983.  Plaintiff's motion for partial summary judgment on her Third Claim for Relief is therefore due to be denied.

## II.   Fourth Claim for Relief

According to the plaintiff, "[t]he Fourth Claim for Relief is based on the failure of the City and its policymakers Dow, Cashdollar and Lackey responsible for the operation of its municipal court, to establish <u>any</u> customs and policies designed to safeguard and insure the broad range of rights of the City's pre-trial detainees under the Fourteenth

Amendment; and the resulting violation of the constitutional rights and the death of Mr. Carpenter in the Mobile Metro Jail in July, 2000, caused by that failure." (Plaintiff's Brief at 15.) The present motion "seeks partial summary judgment only on the official capacity claims in order to avoid, at least for the time being, the more difficult issues involved in resolution of the qualified immunity defense asserted by defendants in their individual capacities." (*Id.* at 15, n. 8.) The plaintiff essentially theorizes that the failure of Municipal Judge Willie Huntley to have ensured Mr. Carpenter's presence at an arraignment hearing within 72 hours of his arrest as required by Rules 4.3, 4.4 and 7.4 of the Alabama Rules of Criminal Procedure violated not only Mr. Carpenter's liberty interest but was the cause of his death. (*Id.* at 15 and 19).

Although Mr. Carpenter was clearly deprived of his right to be brought before the Municipal Judge within 72 hours for an arraignment hearing if he had not posted the bond predetermined for his crime, it was not that deprivation that caused his death but rather, for the reasons stated above, the conduct of the Mobile Metro Jail staff. Plaintiff has, therefore, failed to establish liability on the part of the City for the death of Mr. Carpenter.

As to the violation of Mr. Carpenter's liberty interest, plaintiff argues that "the frequency of 'roll overs' of City arrestees who were not accorded their right to be brought before an impartial magistrate promptly after their arrests (6 to 10 'rollovers' per session of Municipal Court according to Huntley, p. 102-103) . . . constitutes what the Eleventh

Circuit described in _Young v. City of Augusta_ as 'a pattern of constitutional violations . . . such that the municipality knows or should know that corrective measures are needed." (Plaintiff's Reply at 4, _citing_, _Young v. City of Augusta_, 59 F.3d 1160, 1172 (11th Cir. 1995). In _Young_, evidence had been proffered "that a pattern of deliberate indifference to the psychiatric needs of mentally ill inmates existed at the jail of which City policymakers should have been aware." (_Id_. at 1172.)

        Unlike _Young_, however, there is no proof in this record that any of the alleged "roll overs" relied upon by the plaintiff constituted a violation of any liberty interest. For instance, it is undisputed that a "roll over" would occur if an inmate did not appear because he had already bonded out of jail. In that case, no liberty interest has been violated. Consequently, plaintiff has failed to establish any pattern of deliberate indifference in this case, a prerequisite of liability on the part of the City. _See e.g._, _Card v. Miami-Dade County Florida_, 147 F.Supp. 2d 1334, 1343 (S.D. Fla. 2001)("Although § 1983 does not contain an independent state of mind requirement, the Supreme Court has held that a municipality at the very least must act 'deliberately' in order for liability to be imposed.")[5], _citing_, _Board od County Commissioners v. Brown_, 520 U.S. 397, 404, 117

---

[5]In _Card v. Miami Dade County Florida_, the Court concluded that:

> The County may have been negligent in not concerning itself with court-ordered psychological evaluations, but there is nothing to suggest that the County knew, or should have known, about the obvious consequences of not having a policy or procedure to ensure the timely evaluation of inmates. Mr. Card, for example, has not presented evidence that other inmates had previously languished in jail while awaiting psychological

S.Ct. 1382, 137 L.Ed.2d 626 (1997)("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct link between the municipal action and the deprivation of federal rights.").  *See also*, *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1196 (11th Cir. 1994)("[A] 'single incident' [is] an insufficient basis for governmental liability under § 1983.")

## CONCLUSION

For the reasons stated above, it is **ORDERED** that plaintiff's motions for partial summary judgment (Docs. 206 and 208) be and are hereby **DENIED**.  It is **FURTHER ORDERED** that plaintiff's motion (Doc. 222) to deem certain evidence as admissible for purposes of her pending motions for partial summary judgment be and is hereby **GRANTED.**

**DONE** this 4th day of April, 2007.

                                                          s/ W. B. Hand
                                              SENIOR DISTRICT JUDGE

---

evaluations or the County policymakers had been made aware of the risk of such occurrences.

147 F.Supp. 2d at 1346, *citing inter alia*, *Armstrong v. Squadrito*, 153 F.3d 564, 577-79 (7th Cir. 1998)(holding that jail's will-call system was not deliberately indifferent to detainee's substantive due process rights not to be subjected to prolonged detention without court appearance.)